PENITENTIARY   COMPANY   NO. 2   *v.*   ROUNTREE   *et al.*

In view of the provisions of the act of February 25, 1876, " to regulate the leasing out of penitentiary convicts," etc., a contract entered into while that statute was of force, and contemplating that convicts should be employed in conducting a sawmill owned by a private citizen and operated on his premises, must be treated as contrary to public policy, and therefore not enforceable.

Argued June 7, — Decided July 18, 1901.

Complaint.   Before Judge Evans.   Emanuel superior court. October 16, 1900.

*Williams & Williams,* for plaintiff.
*F. H. Saffold,* for defendants.

LUMPKIN, P. J.   The Penitentiary Company brought an action against J. E. & G. R. Rountree, to recover damages alleged to have been sustained by reason of a breach on their part of a contract en-

tered into with the plaintiff on the 15th of June, 1897.   A copy of the contract declared on was attached to the plaintiff's petition. It purported to evidence an agreement whereby the Penitentiary Company obligated itself "to work from thirty-five to fifty male convicts for" J. E. & G. R. Rountree, "said convicts  .  .  to be worked at the sawmill" owned by them, which was located " near Midville, in Emanuel county, Georgia." The following, which is a copy of an order passed by the trial judge, will serve to disclose the fate of the case in the court below and the question which is presented for our determination:   "The defendants having de-murred to the petition of plaintiff on the ground that the contract set out in the petition is in violation of the act of 1876, providing for the lease of the convicts of the State, and for that reason plain-tiff has no right to sue for a breach of the same, it is ordered that the demurrer be sustained and the petition be dismissed at costs of the plaintiff." After due reflection, we have reached the con-clusion that this decision should be upheld.   At the time the con-tract in question was entered into, the act of February 25, 1876, was of force.   See Acts of 1876, pp. 40—45, the provisions of which are to be found in the Penal Code, §§ 1151 et seq.   It pro-vided that the Governor should select a suitable site or place within the limits of Georgia, to "be known as the penitentiary of this State," the expense of procuring the same and providing nec-essary buildings "for the safe-keeping and comfort of the convicts" to be borne by the company or companies to which they might be leased.   "From this prison such convicts as [were] competent to labor on roads, canals, mines, quarries, and making brick [might] be taken out and employed by" the company having charge of them, in carrying out contracts on its part to perform work of that character within the limits of the State.   Such convicts as were "not engaged in working on mines, canals, roads, quarries, and mak-ing brick [were to] be kept at said place or site, known as the peni-tentiary, and there employed upon such works as [might be] con-sistent with their health, age, sex, and strength," or there employed in performing "farm labor" on land owned by the lessee company. Penal Code, § 1153.   Subletting of convicts was prohibited, but provision was made that this restriction should not be held to "pre-vent the lessees from doing the work allowed by this act, under contract with others or through their own agents, and by convicts exclusively under their control and supervision."   Ibid. § 1156.

It will thus be seen that "the work allowed by this act" did not embrace labor to be performed in connection with the operation of a "sawmill" owned by private individuals and located upon their premises. The contract under consideration contemplated that this sort of labor should be performed by the convicts under the control of the Penitentiary Company. Obviously, there was no authority of law for employing them in this class of work, as counsel for the plaintiff in error very frankly conceded. In the brief filed by them, they took the position that: "From a legal or a moral standpoint, there is nothing wrong in such a contract. The most that can be said of such a contract is that it may be malum prohibitum and not malum in se." To the proposition that, from a "moral standpoint, there is no wrong in such a contract," we may reply that this was a matter exclusively for legislative consideration and determination. There is even less force in the suggestion that, from a legal standpoint, such a contract is unobjectionable for the reason that "the most that can be said of [it] is, that it may be malum prohibitum and not malum in se." The law gives recognition to no such distinction. See 15 Am. & Eng. Enc. L. 939, and cases cited in note 1. We are not, however, inclined to hold counsel down to this fallacious argument; for the act of 1876 did not in terms undertake to prohibit the making of contracts other than those therein expressly authorized; and therefore the real question presented for decision is whether or not a contract such as that declared on in this case should be held to be illegal, as being contrary to public policy. We entertain no doubt as to this point. The constitution of this State declares: "There shall be within the State of Georgia neither slavery nor involuntary servitude, save as a punishment for crime after legal conviction thereof." Civil Code, § 5714. Accordingly, under the law as it stood on June 15, 1897, the only protection which persons associating together as a lessee company could successfully invoke, as intervening between themselves and a criminal prosecution for false imprisonment, was the enabling act of 1876, above mentioned. That is to say, this statute authorized certain things to be done which otherwise would be criminal, whereas acts not by its terms brought within its protection remained illegal, if unlawful before its passage. It follows that the legislative will as thus expressed should be regarded as declaratory of the public policy of the State at the

time the agreement under discussion was made.    The General Assembly did not see fit to authorize "sawmill" contracts, or contracts with respect to numerous other legitimate business enterprises and useful occupations.   It is not improbable that the "labor problem" had its influence, and that it may have been considered injudicious to permit "convict labor" to come in competition with "free labor" in the ordinary branches of trade.   Again, the framers of the law may have been reluctant to so "leave the bars down" as to render it possible for helpless criminals to be forced against their will to engage in perilous occupations such, for instance, as the manufacture of powerful explosives.   Really, however, the true reason is of absolutely no consequence; for the law must be enforced as written.

*Judgment affirmed.    All the Justices concurring.*